Jason BERCOVITCH, et al.,
Plaintiffs, Appellees,

v.

BALDWIN SCHOOL, INC., et al.,
Defendants, Appellants.

No. 97–1739.

United States Court of Appeals,
First Circuit.

Heard Nov. 3, 1997.

Decided Jan. 12, 1998.

---

where the plaintiff had voluntarily signed an agreement requiring arbitration. Because the district court denied arbitration and issued a preliminary injunction requiring the school to keep a student whom it had suspended, this case also raises questions, again of first impression, about the extent to which a private independent school must accommodate a student with ADHD whose behavior repeatedly violates school codes of discipline and proper behavior.

William Ramirez–Hernandez, with whom Nora Vargas–Acosta and Vargas & Ramirez, Rio Piedras, PR, were on brief, for appellees.

Alfredo Fernandez–Martinez, with whom Maria Eugenia Rodriguez–Lopez and Martinez Alvarez, Menendez Cortada & Lefranc Romero, San Juan, PR, were on brief, for appellants.

Before TORRUELLA, Chief Judge, LYNCH, Circuit Judge, and DICLERICO,* District Judge.

LYNCH, Circuit Judge.

This appeal arises out of a dispute between a private non-special needs school, and a student with Attention Deficit–Hyperactivity Disorder (ADHD) and his parents. It requires us to decide, as a matter of first impression in this circuit, whether a plaintiff may be compelled to arbitrate claims under the Americans with Disabilities Act (ADA)

## I.

After Jason Bercovitch committed a series of offenses resulting in several suspensions and repeated warnings in sixth grade (and earlier), the Baldwin School indefinitely suspended him in January of 1997. The school gave no indication as to when he might be able to return. Jason and his parents brought suit in federal court against the school, its Headmaster, and Principal,[1] seeking declaratory and injunctive relief under the ADA, 42 U.S.C. § 12182 (1994), the Rehabilitation Act, 29 U.S.C. § 794 (1994), and a Puerto Rican civil rights statute. The Bercovitches claimed that the school had failed properly to accommodate Jason's affliction with ADHD[2] (although they had not previously had him diagnosed or invoked the ADA), and therefore unlawfully discriminated against Jason on the basis of a disability.

The school moved to dismiss the case and to compel arbitration, based on an arbitration agreement between the school and the Bercovitches. The district court denied the motion and maintained jurisdiction over the case. The court granted a preliminary injunction, ordering the school to readmit Jason. When Jason's disruptive behavior continued, the school notified the Bercovitches that the contract of enrollment ended with the sixth grade and the school was unwilling to reenroll him for seventh grade. The Bercovitches filed a contempt motion against the

---

* Of the District of New Hampshire, sitting by designation.

1. The Headmaster and Principal have since been dismissed from the case, and the plaintiffs have not appealed those dismissals.

2. ADHD is an increasingly common diagnosis among children with behavioral difficulties, and is characterized by inattention, hyperactivity, and impulsiveness. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 78 (4th ed.1994).

school. The court did not grant the contempt motion but extended its preliminary injunction, ordered the school to enroll Jason in the seventh grade, and ordered that various alterations be made in the school's normal procedures.

We reverse and hold, on the facts here, that the parties are required to arbitrate the merits of this dispute and that the district court erred in granting preliminary injunctive relief. As described later, we vacate the injunction and refer the matter to arbitration.

## II.

At the beginning of this lawsuit, Jason Bercovitch was eleven years old and in the sixth grade at the Baldwin School. Jason is currently in the seventh grade. The Baldwin School is an independent, non-profit, nonsectarian, English language school located in Bayamon, Puerto Rico. It does not have any special education programs. Jason has attended the school since pre-kindergarten. Over the years Jason has performed extremely well academically, but has had consistent behavioral problems, which the school made efforts to accommodate.[3]

In the fifth grade, Jason was placed on probation for misconduct. Jason's parents met with the school Principal, Jason's psychologist, and Jason's teachers to discuss strategies for accommodating Jason's behavioral problems. The psychologist recommended strategies for dealing with Jason, such as extra positive reinforcement, declining to argue with Jason, providing Jason with time-outs or allowing him to go for walks, and disregarding minor violations. As a result of this meeting, the school made efforts to implement these suggestions and to attend to Jason in an individualized manner. Jason's parents came in for monthly meetings to discuss his progress.

In Jason's sixth grade year, a new principal entered the school. Jason was still on

disciplinary probation at this time. In the fall of his sixth grade year, Jason's behavioral problems became more severe; he received various disciplinary referrals and two suspensions. Jason's behavior included the use of disrespectful language, persistent violations of classroom rules, and defiance of teachers' requests. Frequently Jason would refuse to settle down at the beginning of class, making it impossible for the teacher to begin lessons. He often interrupted class inappropriately, and drew attention to himself. On numerous occasions he made derogatory comments towards other students and teachers, including swearing at other students and teachers, and calling his teachers liars.

The new principal, Nancy Pagan, met with the Bercovitches and took several steps to accommodate Jason's individual needs.[4] Ms. Pagan, on her own initiative, contacted Jason's therapist to discuss his behavioral problems. She was concerned that the efforts to accommodate Jason were not succeeding, and his behavior was getting worse.

Jason's disruptive and disrespectful antics reached a zenith on January 15, 1997, when his behavior became so extreme and incorrigible that the school suspended him indefinitely. This particular event started with Jason calling a teacher unacceptable names[5] in front of other children, after the teacher had asked Jason to keep quiet. Jason was brought to the Principal's office, and he denied ever saying anything wrong. The Principal tried to discuss the matter with Jason, but his anger grew and he began kicking the principal's desk, screaming at the teacher in the room, and saying he did nothing wrong. When the Principal phoned Mrs. Bercovitch, Jason stormed out of the office, kicked the door, stormed down the corridor, ripped everything off of a bulletin board, kicked a lost and found box, and finally, at the Principal's pleading, returned to the Principal's office. The Principal felt the situation was complete-

---

3. We use the language of "accommodation," a key concept under both the ADA and the Rehabilitation Act, although the Bercovitches did not claim during this period that Jason was disabled or that the school was required to make accommodations.

4. These steps are discussed below, at note 14.

5. Jason apparently called a teacher a "jodido lucio," which is Spanish slang and means something along the lines of "fucking show-off."

ly out of control, and contacted the Headmaster to come and meet with her and Mrs. Bercovitch. The Headmaster told Mrs. Bercovitch that the school felt that it had tried everything with Jason and had no other option but to suspend him.

Jason's parents urged the school to reconsider its decision to suspend Jason. They told the Headmaster, Dr. Austen, that they suspected that Jason had ADHD, and that they were presently having him evaluated. This was the first time the parents asserted that their son might have a recognized disorder. The school had earlier recommended that the parents take Jason to be evaluated. The parents did not do so until Jason was suspended. The school refused to reconsider its position.

In early February of 1997, Jason's psychologist diagnosed him with ADHD, as well as with Oppositional Defiant Disorder (ODD), and Childhood Depression. Jason was then referred to a psychiatrist, Dr. Camino, who recommended reinstatement to school, medication, and family therapy. His written report mentioned only ADHD, and not ODD or Childhood Depression.

The school refused to reinstate Jason, asserting that all of the psychiatrist's suggestions for accommodating Jason had been utilized in the past, unsuccessfully. The school also maintained that having Jason in school was too disruptive for the staff and other students.

On March 10, 1997, the Bercovitches filed this action in the United States District Court for the District of Puerto Rico. They sought declaratory, injunctive, and compensatory relief under the ADA, the Rehabilitation Act, and Puerto Rican civil rights laws. The Bercovitches asserted that ADHD was a disability under those laws, and that the school's failure to properly accommodate Jason constituted unlawful discriminatory behavior. The district court held a five-day hearing beginning on March 25 which was limited to the issue of the preliminary injunction. During the preliminary injunction hearing, the school moved to dismiss the action for lack of subject matter jurisdiction.

The school argued that plaintiffs failed to exhaust their administrative remedies, which it says is required by the ADA and the Rehabilitation Act,[6] and that the contract between the parties required arbitration of the matter. The school also moved to compel arbitration and to dismiss the action upon arbitration.

On April 4, the district court, in a ruling from the bench, denied the motion to dismiss and the motion to compel arbitration, and granted the preliminary injunction. A written memorandum and order was issued on April 11. The court found that in order for Jason's behavioral problems to improve, his ADHD needed to be treated in a school setting. The court ordered the school to reinstate Jason immediately, and ordered the parties to work together to arrive at a suitable accommodation plan for Jason. The injunction required that once Jason returned to school, the Bercovitches would enroll in family therapy, and Jason would begin taking medication to control his hyperactivity. The court's order stated that "Baldwin would not be required to make substantial changes in its daily operations in order to accommodate Jason.... Jason would not be immune from Baldwin's disciplinary rules due to his disability." *Bercovitch v. Baldwin Sch.*, 964 F.Supp. 597, 603 (D.P.R.1997). The court also stated:

> [A]lthough the Court is convinced of the reasonableness of the forgoing accommodations, Baldwin will not be forced to unconditionally serve Jason if accommodating him ceases to be reasonable; that is, if after a reasonable amount of time, it is determined that the prescribed treatment has failed to improve Jason's behavior in any significant manner. This Court will thus retain jurisdiction over this matter until at least June of 1997, when a permanent injunction hearing shall be heard. At that point, the parties shall discuss Jason's response to his pharmacological and psychotherapeutic treatment so far.

*Id.* at 606–07. The court also granted attorneys' fees to the Bercovitches.

---

**6.** Because we reverse the preliminary injunction on other grounds, and find that this case is required to go to arbitration, we do not reach the exhaustion issue.

Jason returned to school on April 7. On that day Jason's parents met with the school Headmaster, Principal, and Jason's teachers. The school agreed to a variety of accommodations for Jason. Two weeks later, another meeting took place which included Jason's treating physician. As a result of the meeting, the school drafted a behavioral accommodation plan, which the Bercovitches refused to sign because it required Jason to comply with the school's code of conduct. Several additional attempts at devising an accommodation plan failed. In late April, Jason's parents requested that Jason be re-enrolled in Baldwin School for the following academic year—Jason's seventh grade year. The school stated that it did not intend to re-enroll Jason, given his continued defiance and difficulty in school since the court ordered reinstatement.

The Bercovitches sought to hold the school in contempt of the original April 4 preliminary injunction for failure to accommodate Jason, and to order the school to re-enroll Jason for the following year. After oral arguments on the motions, the court issued an order on June 4, 1997, denying the contempt motion but extending the preliminary injunction and granting the motion to order re-enrollment.

Although the court did not amend the language of its original preliminary injunction order which indicated that Jason would not be immune from the school's disciplinary rules, the court's extension of the preliminary injunction, as well as its later "proposed accommodation plan" for Jason, amounted to a de facto modification of that original order.

The court's plan incorporated the parents' demand that Jason not be subject to the same rules of suspension and expulsion as the other children. *See infra,* p. 152 (discussing the plan).

Currently, Jason is in his seventh grade year at the Baldwin School. Since Jason returned to school pursuant to the district court's preliminary injunction, the record before us shows that Jason's behavioral situation has improved little, if at all. We assume Jason has been on medication, but it has made no difference, on this record. Jason's post-reinstatement behavior has included aggressive conduct towards peers and teachers. He frequently speaks during class and provokes other students.[7] He has tremendous difficulty working with other students, and usually must be separated from them. He defies teachers' orders to quiet down or leave the room, annoying other students and frustrating teachers. On one occasion, Jason acted with extreme disrespect towards his father in the school courtyard, yelling and kicking.

The Headmaster says he has "had to dedicate approximately thirty percent of [his] time to [Jason's] affairs" since Jason has returned to school. The Headmaster's affidavit states that he understands that because of the court order he is not permitted to expel Jason, but that "[i]f it were not for the court's orders and instructions, shortly after his reinstatement on April 7, 1997, Jason would have been expelled for misconduct. Jason continues to have no significant problem learning and meeting the academic requirements, but, he has failed substantially

7. As part of Jason's reinstatement, the school agreed to have all of Jason's teachers fill out forms assessing Jason's behavior on a daily basis. Time after time the forms indicate that Jason was "uncontrollable," "disruptive," and "excitable." During one class Jason called another child a "doofus" after that child failed to answer a question correctly. The forms indicate that Jason argued frequently with other students, and refused to follow the teachers' instructions to quiet down. Jason often spoke out of turn, shouting answers to questions without being called upon. Jason often refused to step outside the classroom when asked by a teacher to do so. There were frequent "interruptions" by Jason in the middle of class. One teacher wrote that during science class "[m]any different times throughout the period, I had to call Jason aside and ask him to calm down and show respect to his peers giving presentations."

One teacher wrote that just as she was about to begin Spanish class, she saw Jason pushing another student. The students were fighting over a desk. The teacher told them neither one could have the desk, at which point the other student sat elsewhere. Jason got extremely upset and began yelling at the teacher, refusing to move from the desk. Jason called the teacher a Spanish swear word. Jason later refused to give the teacher his work, and when she demanded it from him he threw it on her desk, then ripped it up and stormed out of the room. The additional incidents of fighting, abusive language, and provocation are too numerous to list.

and repeatedly to behave in accordance with the standards of conduct."

The parties have engaged in a battle of blaming, both asserting that the other is not in compliance with the district court's injunction. Neither party is satisfied with Jason's progress. The school still seeks to compel arbitration of the merits of this dispute. The district court, however, has not sent the case to arbitration but rather has maintained jurisdiction over it. Despite the language of its original injunction, the subsequent orders of the court made it evident that the school could not apply its normal disciplinary or conduct rules to Jason. A permanent injunction hearing was originally scheduled for September, 1997, but the court postponed the hearing indefinitely pending this appeal.

The school appeals from the denial of the motion to compel arbitration, the initial entry of the preliminary injunction, and from the extension of that preliminary injunction ordering reenrollment of Jason in the seventh grade.

### III. *Arbitration*

■ In 1996, the Bercovitches entered into an enrollment agreement with the school. Clause 5 of that agreement provides that "[t]he Parents, for themselves and in [sic] behalf of the Student[s], agree to abide by the By–Laws of the School ... [c]opies [of which] are available for review at the school main office." The school's by-laws provide for final and binding arbitration of any dispute regarding the school's rules, regulations, or policies.[8] Additionally, Clause 11 of the enrollment agreement provides that "[a]ny and all disputes arising under this contract must be resolved by submission to arbitration" pursuant to the school's by-laws. The school argued in the district court, and now on appeal, that these provisions require the Bercovitches to submit their statutory claims to arbitration, and deprive the district court of jurisdiction over the merits of the dispute.

The Bercovitches neither claimed that their agreement to the terms of this contract was involuntary, nor that they otherwise signed the agreement without knowledge of its arbitration provisions. Instead, they assert that because their claims are based on the school's violation of the ADA—a civil rights statute—their claims are not subject to mandatory arbitration *despite* the existence of a valid arbitration agreement.

The district court found that under the circumstances, the Federal Arbitration Act, 9 U.S.C. §§ 1–14 (1994) ("FAA"), did not require it to compel arbitration. The court held that it had jurisdiction to issue a preliminary injunction even in an arbitrable dispute in order to preserve the status quo pending arbitration. The court did not order arbitration, however, and thus the injunction cannot be justified on the grounds of preserving the status quo pending arbitration.

The district court's refusal to compel arbitration was based on a legal determination, which we review de novo. *See Unum Corp. v. United States,* 130 F.3d 501 (1st Cir.1997). The FAA required the court to compel arbitration of the merits of the dispute. The court was in error, therefore, in refusing to compel arbitration.

### A. *Strong Federal Policy Favoring Arbitration—the FAA*

The issue of arbitrability must be analyzed in light of the strong public policy favoring arbitration, and the strong policies behind the ADA and the Rehabilitation Act. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353–54, 87 L.Ed.2d 444 (1985); *Moses H. Cone Memorial Hosp. v. Mercury Const.*

---

**8.** Article XI of the By–Laws is entitled "Dispute Resolution, Arbitration," and states:

Any and all disputes arising out of these By–Laws or their application or the application of any rule, regulation, policy, resolution or act or contract implemented or carried out pursuant to these By–Laws shall be resolved, in the first instance, by the person charged with the responsibility for the application or implemen-

tation of such. Any interested party affected adversely by the initial resolution of the controversy dissatisfied with the initial determination must submit their position in writing to the board of directors, which, by itself or through such person or persons designated for such purposes and, after due process, will resolve the dispute and such determination will be final and binding.

*Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983). Congress enacted the FAA in 1925 to overcome centuries of judicial hostility to arbitration agreements, *see Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 219–21, & n. 6, 105 S.Ct. 1238, 1241–43, & n. 6, 84 L.Ed.2d 158 (1985), and intended courts to enforce arbitration agreements and to "place such agreements upon the same footing as other contracts." *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 271, 115 S.Ct. 834, 838, 130 L.Ed.2d 753 (1995) (citations and internal quotation marks omitted).

■ The FAA provides that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1994). "Commerce" is broadly defined in this context, and is coextensive with the reach of Congress's Commerce Clause power. *See Allied–Bruce Terminix Cos.,* 513 U.S. at 268, 115 S.Ct. at 836 (construing the reach of the FAA "to the limits of Congress' Commerce Clause power"). The FAA clearly covers the enrollment agreement between the parties in this case—an agreement to pay money for educational services. The parties do not dispute the facial applicability of the FAA.

■ If there are no questions as to the validity of the arbitration agreement itself, a court asked to compel arbitration must determine whether the arbitration agreement in fact covers the dispute in question (assuming the agreement does not assign that question to the arbitrator). *See First Options v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 1923–24, 131 L.Ed.2d 985 (1995); *Mitsubishi Motors Corp.,* 473 U.S. at 626, 105 S.Ct. at 3353–54. In construing an arbitration agreement, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. at 941.

The Bercovitches do not argue that their dispute does not fall within the literal terms of the arbitrability clause. The agreement between the parties here—to arbitrate "[a]ny and all disputes arising out of [the school's] By–Laws or their application or the application of any rule, regulation, policy, resolution or act or contract implemented or carried out pursuant to these By–Laws"—covers the claims that the Bercovitches have brought against the school. The Bercovitches have disputed the application of the school's disciplinary policies to Jason. This is clearly a grievance with a "regulation" or "policy" and under the FAA is subject to compulsory arbitration.

### B. *Arbitrability of ADA Claims*

That the Bercovitches' claims are based on a civil rights statute does not take them outside the reach of the FAA. That was made clear by the Supreme Court case of *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), which rejected arguments, based on earlier cases, to that effect.

In *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Court held that an employee was not precluded from bringing his Title VII claim in federal court, despite the existence of an arbitration clause in a collective bargaining agreement, and the employee's prior submission of his claim to arbitration. In subsequent cases, the Court held a variety of non-civil rights statutory claims subject to mandatory arbitration. *See, e.g., Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (holding enforceable an arbitration agreement for claims arising under the Securities Exchange Act of 1934 and the Racketeer Influenced and Corrupt Organizations Act); *Mitsubishi Motors Corp.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (holding enforceable an arbitration agreement for claims arising under federal antitrust laws); *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (holding enforceable an arbitration agreement for claims arising under the Securities Exchange Act).

In *Mitsubishi,* the Court stated that once it was clear that the "parties' agreement to arbitrate reached the statutory issues," a court must then consider "whether legal con-

straints external to the parties' agreement foreclosed the arbitration of those claims." 473 U.S. at 628, 105 S.Ct. at 3355. The Court decided that nothing in the text, history, or policy of the antitrust laws precluded a waiver of a judicial forum, and that despite the complexity of issues an arbitral forum was adequate to address antitrust claims. *See id.* at 633–34, 105 S.Ct. at 3357–58. Until *Gilmer*, however, it was unclear whether the Court's analysis of the arbitrability of non-civil rights statutes, outside the context of a collective bargaining agreement, would apply equally to civil rights claims. *Gilmer* answered this question in the affirmative.

In *Gilmer*, the Court reiterated the " 'liberal federal policy favoring arbitration agreements,' " 500 U.S. at 25, 111 S.Ct. at 1651 (quoting *Moses H. Cone*, 460 U.S. at 24, 103 S.Ct. at 941), and rejected *Gardner–Denver*'s position that the arbitral forum, as a general matter, was not adequate to address the policies and intricacies of civil rights statutes—specifically the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.* The petitioner in *Gilmer* had, as a term of his employment as a financial services manager, registered as a securities representative with the New York Stock Exchange under an agreement requiring arbitration of disputes. *See Gilmer*, 500 U.S. at 23, 111 S.Ct. at 1650–51. The Court found that this agreement—strikingly similar to the agreement here—covered Gilmer's ADEA claim and was enforceable. *See id.* at 26–27, 111 S.Ct. at 1652–53.

The Court did indicate that there might be some cases in which the arbitral setting is an inappropriate forum for the resolution of statutory claims, but placed the burden squarely on the plaintiff to prove that this is so. *See id.* at 26, 111 S.Ct. at 1652 (stating

that a party should be held to its own bargain to arbitrate unless it can show Congress intended to preclude a waiver of a judicial forum for the statutory claims at issue). If Congress intended to preclude a waiver, that intention would be discoverable in the text or legislative history of the statute, or in an "inherent conflict" between arbitration and the underlying goals of the statute. *See id.*[9]

*Gilmer* controls this case. The burden is on plaintiffs to prove that Congress, in enacting the ADA, intended to preclude a prospective waiver of a judicial forum for ADA claims. In order to carry this burden, plaintiffs must point to something in the text or legislative history of the ADA that precludes enforcement of arbitration agreements as to ADA claims, or show an "inherent conflict" between the policies and purposes of the ADA and mandatory arbitration.

*Gilmer* does not appear to have changed the traditional rule that courts look first to the text of a statute, and then to the legislative history if the meaning of the text is ambiguous. *See Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); *United States v. Bohai Trading Co.*, 45 F.3d 577, 581 (1st Cir.1995). The plain language of the text of the ADA contemplates arbitration, there is no inherent conflict, and while the legislative history evidences a concern that agreements to arbitrate should be voluntary, the Bercovitches do not claim the agreement was not voluntary.

Unlike the ADEA, the ADA expressly encourages arbitration of disputes. Section 12212 of the ADA states that,

> [w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including . . .

---

9. The Court found nothing in the text or legislative history of the ADEA that would preclude a waiver, and did not find any inherent inconsistency between the ADEA's policies and enforcing an agreement to arbitrate age discrimination claims. *See id.* at 27–30, 111 S.Ct. at 1652–54 (rejecting petitioner's claim that arbitration would interfere with the EEOC's enforcement of the ADEA, and his generalized attacks on the adequacy of arbitration procedures). The Court additionally noted that arbitrators were fully competent and authorized to provide the full

panoply of remedies afforded by the ADEA, including equitable relief. *See id.* at 32, 111 S.Ct. at 1655. The Court appeared to leave the door open, however, to more specific challenges to arbitral proceedings, such as specific bias in the selection of arbitrators or lack of procedural protections. *See id.* at 30, 111 S.Ct. at 1654. We note that in the case before us, the Bercovitches have made no general, let alone specific, claims of bias or unfairness as to the arbitral forum where their claims would be heard.

arbitration, is encouraged to resolve disputes arising under this chapter.

42 U.S.C. § 12212. The meaning of this language, far from evidencing an intention to preclude arbitration, can only be interpreted as favoring it.[10] If this language were not interpreted to permit prospective waiver of a judicial forum, it would be superfluous. Litigants are always permitted to resolve their disputes extrajudicially, with or without statutory language authorizing such action. This language adds nothing if it does not mean that litigants can anticipatorily waive a judicial forum for ADA claims. *See Babbitt v. Sweet Home Chapter*, 515 U.S. 687, 698, 115 S.Ct. 2407, 2413, 132 L.Ed.2d 597 (1995) (statutory language is not to be treated as surplusage).

Despite this clear language, plaintiffs assert that certain sections of the legislative history of the ADA, although not the text, prove that Congress intended to preclude mandatory arbitration of ADA claims. The House Judiciary Committee Report, incorporated by reference into the House Conference Report, discusses the ADA alternative dispute resolution section as follows:

> This section encourages the use of alternative means of dispute resolution, where appropriate and to the extent authorized by law. These methods include ... arbitration.
>
> ... The Committee wishes to emphasize, however, that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by this Act. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of this Act. This view is consistent with the Supreme Court's interpretation of title VII of the Civil Rights Act of 1964, whose remedial provisions are incorporated by reference in

title .I. The Committee believes that the approach articulated by the Supreme Court in *Alexander v. Gardner–Denver Co.* applies equally to the ADA and does not intend that the inclusion of Section 513 [the ADA arbitration section] be used to preclude rights and remedies that would otherwise be available to persons with disabilities.

H.R.Rep. No. 101–485(III) (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 499 (footnote omitted). *See also* H.R.Rep. No. 101–596 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 598.

In light of the language in the ADA text itself, this legislative history is not sufficient to rebut the presumption in favor of arbitration. This language, which was drafted prior to the *Gilmer* decision, appears simply to endorse and track Supreme Court precedent on the question of the arbitrability of civil rights claims. The committees appear to have been concerned with the issues dealt with in *Gardner–Denver:* the unfairness of enforcing arbitration agreements in collective bargaining agreements or employment contracts that the individual plaintiff may have had no knowledge of or influence over. It expresses a concern for *involuntary* agreements to arbitrate. We reiterate that the Bercovitches have made no claim that their agreement to arbitrate was somehow involuntary, nor is there any evidence of such unfairness.

Finally, we do not find any "inherent conflict" between mandatory arbitration of ADA claims and the policies behind the ADA. The ADA condemns discrimination based on disability, just as the ADEA condemns discrimination based on age. *Gilmer* found that arbitrators are competent to interpret age discrimination statutes and the policies behind them, as well as to award all the relief authorized by the statutes. There is no reason to think that the ADA presents a stronger policy case against arbitration than ADEA, and many reasons to think it does not.

---

**10.** We note that in dealing with disabled children and public education obligations in the context of the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq.* (1994), Congress also encouraged a number of meetings and methods of resolving potential disputes between parents and schools before there can be resort to a judicial forum.

If anything, the ADEA evinces a stronger policy against a prospective waiver of a judicial forum than does the ADA. In contrast to the ADA, the plain language of the ADEA, as amended by the Older Workers Benefits Protection Act in 1990 (before *Gilmer* was argued or decided), expressly requires that any waiver of rights under the ADEA be knowing and voluntary. *See* 29 U.S.C. § 626(f) (1994). It also specifically defines the conditions under which a waiver may be knowing and voluntary. The ADA does not have any express protections against waiver of rights under the ADA.

In the end, this case is not distinct enough from *Gilmer* to persuade us that the ADA precludes a waiver of a judicial forum through a voluntary prospective agreement to arbitrate. Although the issue of arbitrability of an ADA claim is one of first impression in this circuit, at least one of our sister circuits agrees with us. *See Miller v. Public Storage Management, Inc.*, 121 F.3d 215, 218 (5th Cir.1997) (holding ADA claim subject to arbitration and stating that the explicit language of the ADA "persuasively demonstrates Congress did not intend to exclude the ADA from the scope of the FAA"). Plaintiffs have waived a judicial forum, by their own bargain, and must now submit their ADA and Rehabilitation Act [11] claims to arbitration.

### IV. *Preliminary Injunction*

We agree that the district court had jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration. *See Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir.1986) ("[A] district court can grant injunctive relief in an arbitrable dispute pending arbitration, provided the prerequisites for injunctive relief are satisfied.").[12] But that is not what the district court did. Nonetheless, the question remains of the appropriateness of preliminary injunctive relief to preserve the status quo pending arbitration. We turn to whether plaintiffs met their burden of justifying preliminary injunctive relief.

A trial court's decision to issue a preliminary injunction in an ADA case, as in all cases, must be based on four factors: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) whether the balancing of hardships favors the issuance of the injunction; and (4) what effect, if any, the issuance or non-issuance of the injunction will have on the public interest. *See EEOC v. Astra USA, Inc.*, 94 F.3d 738, 742 (1st Cir.1996) (Title VII); *Gately v. Massachusetts*, 2 F.3d 1221, 1224 (1st Cir.1993) (ADEA). We review the district court's grant of a preliminary injunction with deference, and will affirm unless the court committed a mistake of law or abused its discretion. *See Astra USA*, 94 F.3d at 743. We find that the district court misapprehended certain aspects of the law under the ADA and the Rehabilitation Act, and abused its discretion in granting injunctive relief. Because we find plaintiffs did not meet their burden on likelihood of success, we do not reach the other factors.

The plaintiffs did not meet their burden of demonstrating probability of success on the merits in at least three respects. The district court's conclusion to the contrary is based in part on errors of law. First, even assuming that Jason has a disability within the meaning of the ADA,[13] the alterations in

---

**11.** Nothing in the Rehabilitation Act evidences a Congressional intent to preclude arbitration, even assuming *dubitante* that the Rehabilitation Act provides jurisdiction here. *See infra*, note 13.

**12.** The *Teradyne* court further stated:

We believe this approach reinforces rather than detracts from the policy of the Arbitration Act [and that] the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve

the status quo pending arbitration and, ipso facto, the meaningfulness of the arbitration process.

*Id.* (citations omitted).

**13.** As noted earlier, plaintiffs brought their claims under both the ADA and the Rehabilitation Act. The Rehabilitation Act applies only if the Baldwin School is a recipient of federal funds. We are doubtful that Baldwin achieves that status by mere receipt of some small amount of educational computer material from the Commonwealth of Puerto Rico, which the Commonwealth buys with federal funds. We need not

the school's normal requirements and standards that were sought by the plaintiffs and imposed by the district court went far beyond the "reasonable accommodations" required by statute. It was beyond the power of the district court to order a school to suspend its normal codes of conduct in order to tolerate disruptive and disrespectful conduct when that behavior impaired the educational experience of the other students and significantly taxed the resources of the faculty and administration. Second, the district court applied an incorrect standard and plaintiffs did not meet their burden of showing probability of success that Jason was "otherwise qualified." Third, plaintiffs did not, on this record, meet their burden of showing probability of success that Jason is disabled within the meaning of the Act.

## A.   Reasonable Accommodations

■ If the requested accommodations call for "substantial modifications" of defendant's program, the accommodations are not reasonable, and will not be required. *See Southeastern Community College v. Davis,* 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979) ("Section 504 [of the Rehabilitation Act] by its terms does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to partici-

pate."); *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794–95 (1st Cir.1992) (medical school was not required to make accommodations for learning disabled student where such accommodations would substantially alter the program or lower academic standards).

■ Here, the plaintiffs insisted that Jason be exempted from the normal operation of the school's disciplinary code. Although the court expressly stated in its preliminary injunction order that Jason "would not be immune from Baldwin's disciplinary rules," its own "accommodation plan" implemented the parents' desire that Jason only be suspended after at least three warnings, and then only for the remainder of the day. Thus, the normal progressive discipline built into the school's code was enjoined and the school was effectively enjoined from suspending Jason, as it would any other student, for repeated disruptive behavior.

This was an alteration of a fundamental requirement of the school's academic program and as such is not required by the ADA. *See* 42 U.S.C. § 12182(b)(2)(A)(ii) (1994). This is not a case of a single or minor disciplinary code violation resulting from a disability and which could be accommodated with a non-fundamental adjustment. Indeed, the record is replete with efforts by the school to make adjustments,[14] hoping to

---

decide the issue of applicability of the Rehabilitation Act in light of our disposition.

For present purposes, we treat the ADA and the Rehabilitation Act as imposing parallel requirements. *See E.E.O.C. v. Amego, Inc.,* 110 F.3d 135, 143 (1st Cir.1997) (citing 29 U.S.C. § 794(d)); *Katz v. City Metal Co.,* 87 F.3d 26, 31 n. 4 (1st Cir.1996) (noting that § 504 of the Rehabilitation Act "is interpreted substantially identically to the ADA.").

**14.**   To give some examples: In sixth grade Jason created a disturbance in music class and stopped the music teacher from conducting her lessons. The music teacher called the Principal, Ms. Pagan, who took Jason out of class and spoke with him. Jason stated that he hated music class, and refused to ever go again. Ms. Pagan made a deal with Jason that if he went to three music classes, he could elect not to go to the fourth. Ms. Pagan testified at the preliminary injunction hearing that it was not at all customary to make such deals with children, but that she was familiar with Jason's difficulties and she "wanted to work with him in a positive way."

On another occasion, Jason was brought to the principal's office because he and another student had been arguing and swearing during recess. The punishment for both was that recess would be revoked for the following day. The other student complied; Jason flatly refused to miss recess, saying it was not his fault. Ms. Pagan initially insisted on her original punishment, but ultimately offered Jason an alternative penalty: instead of missing recess he could pick up ten pieces of trash from the school yard. Jason agreed, and got to have his recess. As to this accommodation, Ms. Pagan again testified that it was not customary, but that she "was trying to do everything possible to have Jason have a good sixth grade year. [She] was trying to work with him from the conversation that [she] had with Mr. and Mrs. Bercovitch in bringing out the positive."

After another incident when Jason used disrespectful language toward a teacher and interrupted class, there was a meeting with Jason's parents. Mr. Bercovitch suggested positive reinforcement and moving Jason's desk to the back

alter Jason's intolerable behavior. All of these accommodations came to naught, as Jason's disruptions continued.

The Baldwin School is a private college preparatory school. Like other private schools, it is covered by Title III of the ADA as a place of public accommodation. That a private non-special needs school is covered by the ADA does not, as a matter of law, transform it into a special needs school. The Baldwin School is not equipped to handle special needs students with severe behavioral problems. Despite the district court's order that Baldwin create an individualized "accommodation plan" for Jason which creates special treatment for Jason, the ADA imposes no requirement on Baldwin to devise an individualized education plan such as the IDEA requires of public schools. The district court order comes perilously close to confusing the obligations Congress has chosen to impose on public schools with those obligations imposed on private schools.

The district court also erred in not appropriately crediting the judgment of the educational officials. As this court noted in *Wynne*, 976 F.2d at 795, the decision by the school here was entirely reasonable "that no further accommodation could be made without imposing an undue (and injurious) hardship on the academic program." Here, there is not a shred of evidence of discriminatory

intent toward disabled persons on the part of the school. There is not even a whisper of a suggestion of stereotyping based on handicap. Care should be taken before a court in these circumstances substitutes its judgment for that of the school. *See Amego*, 110 F.3d at 145; *cf. School Bd. v. Arline*, 480 U.S. 273, 288, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987) (noting that deference should be given to judgment of public officials as to whether a plaintiff is "otherwise qualified").

Because the preliminary injunction went far beyond the requirements of reasonable accommodation, it was in error. The events after the issuance of the initial injunction only confirm the error. Nothing changed after Jason was reinstated, despite the school's efforts to comply with the court's order and despite Jason being on medication and under professional care.[15] According to the Headmaster, since Jason's reinstatement, his continued misconduct and the school's inability, under the injunction, to discipline Jason, have lead to a significant consumption of staff time and a staff morale problem. Jason's teachers are unable to teach effectively and other students are suffering.[16] The Headmaster's affidavit states that

> other students in Jason's classes show increasing anger and frustration at the continued disruption of the classes by Jason.

of the room. The principal agreed. On a regular basis Ms. Pagan would speak with Jason, ask him if he was having a good day, tell him she was proud of him for his good work and for behaving appropriately.

Despite these accommodations, Jason's disruptive behavior continued.

**15.** Examples of Jason's unacceptable behavior following reinstatement include: During an assembly, Jason and another student engaged in a shoving and name-calling match, requiring teachers to separate them. During a music class Jason was speaking out of turn and the teacher asked him to quiet down, at which point Jason stated he wanted to switch seats; after the teacher denied his request Jason asked the teacher, in front of the whole class, what was the teacher's problem and whether she was "going through a divorce or something like that." The music teacher told Jason to go to the office, which he refused to do, and when the teacher took his arm he threw himself onto the floor in defiance of the teacher's requests. During a language arts class Jason completed an exam early, and began talking and disturbing others still taking the exam.

The teacher asked him to keep quiet, and he became agitated and argued with the teacher. The teacher asked him to leave the room, and he refused.

**16.** An incident during a language arts class provides a good illustration of the upsetting and frequently disabling nature of Jason's behavior. After class Jason's teacher wrote:

> Jason was extremely wound up.... Jason was screaming at outrageous levels in order to be heard. Whenever Jason did this, I stopped what I was saying until Jason quieted down. Other students were very frustrated with Jason and asked him in relaxed tones to please quiet down because they were trying to concentrate. Jason always had a comment back to them in Spanish. With about 25 minutes to go in the period, it reached the point where Jason was uncontrollable and we, as a class, could not continue with the lesson I planned for the day. We spent the rest of the period working on drawing comic strips dealing with self-respect and courage.

The situation at the school, related to this student, from the standpoint of administration and the providing of its usual educational services in the classes he is attending, has become extremely disruptive and burdensome.

Accommodating Jason was and continues to be unduly burdensome and costly for the school. Rather than extend the injunction to require enrollment of Jason for the next year, the district court should have, in the face of such evidence, vacated the preliminary injunction.

### B. *"Otherwise Qualified"*

■ The district court erroneously stated and applied the standard for whether a plaintiff is "otherwise qualified" for purposes of these acts.

Although the plaintiffs have not raised this point, we note there is an initial question about the role played by the "otherwise qualified" test under Title III of the ADA. Title III states that "[n]o individual shall be discriminated against on the basis of a disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation...." 42 U.S.C. § 12182(a) (1994). Notably, it does not use the "qualified individual" language that Titles I and II use. *See* 42 U.S.C. § 12112 (1994) (Title I covering employment) ("No covered entity shall discriminate against a *qualified* individual with a disability because of the disability of such individual in regard to job application procedures [or other employment procedures].") (emphasis added); 42 U.S.C. § 12132 (1994) (Title II covering public services) ("[N]o *qualified* individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity ....") (emphasis added). Neither the First Circuit nor the Supreme Court have ruled on the significance of this distinction. We find little difference in this distinction, because many of the issues that arise in the "qualified" analysis, also arise in the context of the "reasonable modifications" or "undue burden" analysis. That is, if more than reasonable modifications are required of an in-

stitution in order to accommodate an individual, then that individual is not qualified for the program.

Further, the ADA expressly provides that it be enforced in a manner consistent with the requirements of the Rehabilitation Act. *See* 42 U.S.C. § 12117(b) (1994). This court has interpreted the two acts similarly. *See Amego,* 110 F.3d at 143; *Katz,* 87 F.3d at 31 n. 4. And Congress has mandated that nothing in the ADA shall be construed to apply a lesser standard than under Title V of the Rehabilitation Act. *See* 42 U.S.C. § 12201(a) (1994).

Under the Rehabilitation Act, in *Southeastern Community College,* 442 U.S. at 405, 99 S.Ct. at 2366, the Supreme Court expressly rejected an interpretation of "otherwise qualified" that would prohibit an institution from considering an individual's limitations when determining that person's eligibility for an academic program. The Court stated that "an otherwise qualified person is one who is able to meet all of a program's requirements *in spite of* his handicap." *Id.* at 406, 99 S.Ct. at 2367 (emphasis added). The law does not require an academic program to compromise its integral criteria to accommodate a disabled individual. *See id.*

In contrast, the district court articulated the standard as a "but for" one: The court found that Jason was "but for his disability, clearly or otherwise qualified to participate in Baldwin School's educational program. His conduct cannot be the measure of his qualification because his conduct is, to a significant extent, a manifestation of his disability." *Bercovitch,* 964 F.Supp. at 602. This was error.

Plaintiffs did not meet their burden of showing on preliminary injunction a probability of success that Jason was "otherwise qualified." As Baldwin correctly points out, the district court focused on only two of the school's requirements for admission/retention—academic performance and payment of tuition—and ignored the school's conduct and disciplinary requirements. A school's code of conduct is not superfluous to its proper operation; it is an integral aspect of a productive learning environment. Therefore Ja-

son cannot be "otherwise qualified" unless, with reasonable accommodations, he can meet disciplinary requirements. As the discussion regarding reasonable accommodations makes clear, plaintiffs did not meet this burden.

### C. Disability

In order to obtain an injunction, plaintiffs also had the burden of showing they were likely to succeed in establishing Jason was "disabled" within the meaning of the ADA. *See Jacques v. Clean–Up Group, Inc.*, 96 F.3d 506, 511 (1st Cir.1996); *Katz*, 87 F.3d at 30–31. While plaintiffs may be able to make such a showing before the arbitrator, there is a higher burden—probability of success—at the preliminary injunction stage. *See Feinstein v. Space Ventures, Inc.*, 989 F.2d 49, 51 (1st Cir.1993) (reversing grant of preliminary injunction where plaintiff failed to establish probability of success on the merits). At best the evidence of record shows a draw.

"Disability" has a specific legal meaning. The statutory terms require that there be "a physical or mental impairment that substantially limits one or more of the major life activities." [17] 42 U.S.C. § 12102 (1994); 29 U.S.C. § 706(8) (1994). Plaintiffs' evidence must satisfy three distinct factors: (1) Jason has a physical or mental impairment; (2) which affects a major life activity; (3) to a substantial degree. *See Abbott v. Bragdon*, 107 F.3d 934, 938–39 (1st Cir.1997); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir.1997) (finding that plaintiff's dysthymia was not a disability because it did not substantially affect a major life activity).

On the facts of a specific case, a plaintiff diagnosed with ADHD may have a mental impairment within the meaning of the statute.[18] *See* 28 C.F.R. § 36.104 (1997). But that impairment must also limit a major life activity to a substantial degree. *See Abbott*, 107 F.3d at 941 (noting that the determination whether someone has a disability "calls for an individualized inquiry" regarding the particular plaintiff in question) (citing 29 C.F.R.App. § 1630.2(j) (1996)). Plaintiffs argued and the district court found that Jason's ADHD affected to a substantial degree the major life activity of learning. *See* 28 C.F.R. § 36.104 (1997) (defining major life activities to include learning and working). We agree that learning is a major life activity.

But the record shows that Jason never experienced significant academic difficulties, and in fact has excelled academically for most of his years at the Baldwin School. Although Jason's hyperactivity and distractibility may affect his capacity to achieve his absolute maximum learning and working potential, there is practically no evidence that it has substantially impaired his basic learning abilities. Under the regulations for Title I of the ADA (which uses the same definition of disability as Title III), a person is "substantially limited" in a major life activity when he is

(i) Unable to perform a major life activity that the average person in the general population can perform; or [is] (ii) Significantly restricted as to the condition, manner or duration under which [he] can per-

---

**17.** The definition of a disability also includes (1) a record of a mental or physical impairment, and (2) being regarded as having such an impairment. 42 U.S.C. § 12102 (1994). Neither of these is applicable to this case.

**18.** Although the relevant regulations do not specifically list ADHD as an included physical or mental impairment, the list is not exhaustive and includes "[a]ny mental or psychological disorder such as mental retardation ... emotional or mental illness, and specific learning disabilities...." 28 C.F.R. § 36.104 (1997). ADHD is not a learning disability per se.

It is listed as a "mental disorder" in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM–IV). We particularly note that the DSM–IV admon-

ishes that because of the "imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis[,] in most situations, the clinical diagnosis of a DSM–IV mental disorder is not sufficient to establish the existence for legal purposes of a 'mental disorder,' 'mental disability,' 'mental disease,' or 'mental defect.' In determining whether an individual meets a specified legal standard ... additional information is usually required beyond that contained in the DSM–IV diagnosis.... It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability." *DSM–IV* at xxiii.

form a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (1997). *See also Soileau,* 105 F.3d at 15–16 ("Impairment is to be measured in relation to normalcy, or, in any event, to what the average person does.").

The most favorable evidence in the record for Jason's claim that his learning ability has been substantially impaired is that his grades dipped slightly during the Fall of his sixth grade year—his most severe period of behavioral unrest. Even during that period, however, Jason's learning ability and academic success did not fall below that of the average student his age. In fact, his achievement remained consistently above average. Under these circumstances, it would be error to conclude that plaintiffs have met their burden of showing a probability of success that Jason suffered a substantial limitation of a major life activity.

### V.

This is a difficult case and we do not fault the district court, which was operating in largely uncharted areas of law and under considerable time pressure. There is a practical and human problem about the remedy here and the education of a very troubled young man. Jason is enrolled in seventh grade at the Baldwin School only because of the preliminary injunction, which was issued in error. The school requests that we immediately vacate the injunction to keep Jason from continuing to disrupt its educational program. The school will not, by reason of

this opinion, any longer be required to keep Jason as a student.[19] But, in fairness, some time for transition appears appropriate.

At oral argument in this case in November 1997, there was lively questioning on the propriety of the issuance of the injunction and the failure to send the case to arbitration. We also explicitly asked plaintiffs' counsel what provisions his clients were making should the injunction be vacated. Under these circumstances, we order that portion of our mandate vacating the preliminary injunction shall not issue until the 30th day from the date of this opinion. During this period the Bercovitches may find another school for Jason, one better suited, we hope, to meet his needs. Mandate shall issue in the normal course reversing the order of the district court refusing to compel arbitration and requiring that the case be sent to arbitration.[20]

Because the two claims which are the basis for federal jurisdiction are to be sent to arbitration, the district court shall consider whether the case should be dismissed or stayed.[21] If the case is stayed, in light of this opinion, there is no further basis on which plaintiffs may seek injunctive relief during the stay.

Costs to defendants.

---

19. What the school chooses to do voluntarily while the matter is in arbitration is another matter.

20. Accordingly, the award of attorneys' fees to the plaintiffs should be vacated as they are not prevailing parties. *Cf.* 42 U.S.C. § 12205 (court, in its discretion, may award attorneys fees to prevailing party in ADA action).

21. Section 3 of the FAA requires that where issues brought before a court are arbitrable, the court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the [arbitration] agreement." However, a court may dismiss, rather than stay, a case

when all of the issues before the court are arbitrable. *See Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992); *Sparling v. Hoffman Const. Co.,* 864 F.2d 635, 637–38 (9th Cir.1988); *Sea–Land Serv., Inc. v. Sea–Land of Puerto Rico, Inc.,* 636 F.Supp. 750, 757 (D.P.R. 1986). Federal subject matter jurisdiction in this case is based on a federal question, rather than diversity of citizenship. Because we find that the two federal claims in this case—those brought under the ADA and the Rehabilitation Act—are arbitrable, there is only pendent jurisdiction over the one state-law claim. The district court therefore has discretion to dismiss the entire action.