Craig PENN, Plaintiff,

v.

**RYAN'S FAMILY STEAKHOUSES, INC. Defendant.**

No. 1:99–CV–0530.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

May 3, 2000.

Christopher C. Myers, Lori W. Jansen, Christopher Myers and Associates, Fort Wayne, IN, for Craig Penn, Plaintiff.

Michael T. Graham, Jackson Lewis Schnitzler and Krupman, Chicago, IL, Stephen F. Fisher, Jackson Lewis Schnitzler & Krupman, Greenville, SC, for Ryan's Family Steak House Inc, Defendant.

### *ORDER*

WILLIAM C. LEE, Chief Judge.

Currently before the court is the defendant's, Ryan's Family Steakhouses, Inc. (hereinafter "Ryan's") Motion to Dismiss and Petition to Compel Arbitration and Stay Proceedings, filed on January 21, 2000. Mr. Penn filed his Response on March 3, 2000, and Ryan's Reply was filed on March 13, 2000. Mr. Penn's Sur Reply then followed on March 21, 2000. For the following reasons, the court will DENY the defendant's Motion to Dismiss and Petition

to Compel Arbitration and Stay Proceedings.

### FACTS [1] AND PROCEDURAL HISTORY

Plaintiff, Mr. Craig Penn, applied for a job at Ryan's in Fort Wayne, Indiana, on June 4, 1996. The application included a "Job Applicant Agreement to Arbitration Of Employment–Related Disputes" (hereinafter "Agreement"). The Agreement, between the applicant and Employment Dispute Services, Inc. (hereinafter "EDS"), explained that:

> Your potential Employer ("signatory company" or "Company") has entered into an agreement with Employment Dispute Services, Inc. ("EDS") to arbitrate and resolve any and all employment-related disputes between the Company's employees (and job applicants) and the Company.

.   .   .   .   .

> B. 1. Any employment-related dispute between the Company, Me, and/or other signatories which would otherwise be brought in State or Federal court will be brought ONLY in the EDS arbitration forum and under EDS Rules and Procedures, as modified or amended from time to time. (Other signatories to the same Agreement with EDS may be, for example, supervisors, managers, and agents of the Company.)

Agreement, at introductory paragraph & B(1). In signing the Agreement, the applicant forfeited any appeal: "The decision of an EDS arbitration panel is final and binding on all parties. There is no appeal by any party on the merits of the dispute either to State or Federal court." *Id.* at B(2)(B).

The cover page of the application packet given to Mr. Penn on June 4th explained that

> [i]n order for you to be considered for employment at Ryan's Family Steak Houses, Inc., you must agree to the terms and conditions in the attached Job Applicant Agreement to Arbitration of Employment Related Services ("Arbitration Agreement"). Your failure to sign and accept the Arbitration Agreement and its related EDS Rules and Procedures will terminate the application process. A Copy of the EDS Rules and Procedures is provided to you with this application package. Should you have any questions regarding the Arbitration Agreement and how it works, please ask the manager conducting your interview.

Application to Employment, Notice to All Applicants, exhibit A to Affidavit of James Randolph Hart [2] ("Hart Affidavit").

Mr. Penn signed the Agreement, and was eventually hired by Ryan's in July of 1996 as a server. There was no employment contract entered into between Ryan's and Mr. Penn. Mr. Penn filed a charge with the EEOC on December 17, 1998, alleging discrimination and retaliation under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 et seq. The details of Mr. Penn's claims are unnecessary to the court's analysis at this juncture. Mr. Penn received a Notice–of–Right–to–Sue Letter on September 30, 1999, and then filed his complaint with this court on December 29, 1999.

### APPLICATION OF THE LAW

The crux of the problem in this case is the enforceability of an arbitration agreement requiring an individual employee to use arbitration as a condition of employment in the place of judicial resolution of his statutory claims arising under the

---

1. As stated by plaintiff, "for the most part, [Mr.] Penn agrees with the factual background as proffered by Ryan's in its Memorandum." *See* Answer Memorandum to Ryan's Family Steak House, Inc., Motion to Dismiss and Petition to Compel Arbitration and Stay Proceedings, at 1.

2. Mr. Hart is Vice President of Human Resources for Ryan's.

ADA.[3] In support of arbitration, Congress passed the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq. "It's purpose was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and has been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1647, 114 L.Ed.2d 26 (1991). The FAA manifests "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). When a valid agreement to arbitrate exists between the parties and covers the matter in dispute, the FAA requires the federal courts to stay any ongoing judicial proceedings, 9 U.S.C. § 3, and to compel arbitration, *id.* at § 4.

The threshold question for this court is whether ADA claims such as Mr. Penn's are even arbitrable. In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the United States Supreme Court held that in certain circumstances statutory claims could be subject to binding, compulsory arbitration:

> [i]t is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA. Indeed, in recent years we have held enforceable arbitration agreements relating to claims arising under the Sherman Act, 15 U.S.C. §§ 1–7; § 10(b) of the Securities Act of 1934, 15 U.S.C.

§ 78j(b); the civil provisions of the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.; and § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2). . . . In these cases we recognized that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by that statue; it only submits their resolution in an arbitral, rather than judicial, forum."

*Id.* at 26, 111 S.Ct. at 1652. While *Gilmer* dealt with the ADEA, several circuits have held that ADA claims are also subject to arbitration. *See Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 148–51 (1st Cir.1998) ("In the end, this case is not distinct enough from *Gilmer* to persuade us that the ADA precludes a waiver of a judicial forum through a voluntary prospective agreement to arbitrate."); *Miller v. Public Storage Management, Inc.*, 121 F.3d 215, 218 (5th Cir.1997) ("Congress did not intend to exclude the ADA from the scope of the FAA"); *see also* 42 U.S.C. § 12212 (revealing that the text of the ADA itself is arbitration friendly: "Where appropriate and to the extend authorized by law, the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under this chapter."). The Seventh Circuit has not expressly stated that ADA claims such as Mr. Penn's are arbitrable. However, in *Gibson v. Neighborhood Health Clinics, Inc.*, the Seventh Circuit impliedly approved of this proposition when it jumped from the threshold question of the arbitrability of ADA claims and

---

**3.** This issues has been characterized as the "proverbial 'new kid on the block.' " *Cole v. Burns International Security Services*, 105 F.3d 1465, 1473 (D.C.Cir.1997). As the D.C. Circuit explained,

> (1) This is not a case in which an employee and an employer, in the face of a legal problem, have made an ad hoc, mutually voluntary decision to pursue arbitration or some other form of alternative dispute resolution in lieu of formal litigation. Rather, this case involves a situation in which an employee has been required, as a condition

of employment, to forego all access to jury trials and (at the employer's option) to use arbitration in place of judicial fora for the resolution of statutory as well as contractual claims. (2) This is not a case involving the enforcement of arbitration under a collective bargaining agreement. The employee here is acting alone, without ties to union representation and without any limitations imposed by a collective bargaining contract.

*Id.* at 1472–73 (footnote omitted).

reached the controlling issue of whether the arbitration agreement at issue were valid. *See Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997) ("The parties agree that an employee and employer may contractually agree to submit federal claims, including Title VII and ADA claims, to arbitration. *See Gilmer*, 500 U.S. at 35, 111 S.Ct. at 1656.").

With that by way of explanation, this court, too, reaches the remaining (and controlling) issue: whether a binding arbitration agreement exists and compels Mr. Penn to submit his ADA claims to arbitration. The FAA provides that agreements "to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Seventh Circuit explained in *Gibson v. Neighborhood Health Clinics, Inc.* that

> [a]n agreement to arbitrate is treated like any other contract. *Kresock v. Bankers Trust Co.*, 21 F.3d 176, 178 (7th Cir.1994). If there is no contract there is to be no forced arbitration. *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 53 (7th Cir.1995); *Farrand v. Lutheran Bhd.*, 993 F.2d 1253, 1255 (7th Cir.1993) (citing *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)); *Adamovic v. METME Corp.*, 961 F.2d 652, 654 (7th Cir.1992). In determining whether a valid arbitration agreement arose between the parties, a federal court should look to the state law that ordinarily governs the formation of contracts. 9 U.S.C. § 2; *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995). In the present case, because Indiana was the situs of all relevant events in this dispute, we look to the contract law of that state. *First Options of Chicago*, 514 U.S. at 944, 115 S.Ct. at 1924.

> Indiana courts apply ordinary contract principles to arbitration agreements. *St. John Sanitary Dist. v. Schererville*, 621 N.E.2d 1160, 1162 (Ind.Ct.App. 1993); *see also Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.E.2d 583 (1974); *International Union of Oper. Engineers v. Indiana Constr. Co.*, 910 F.2d 450, 453 (7th Cir.1990). Under Indiana contract law, the party seeking to compel arbitration has the burden of demonstrating the existence of an enforceable arbitration agreement. *Wilson Fertilizer & Grain v. ADM Milling Co.*, 654 N.E.2d 848, 849 (Ind. Ct.App.1995). We also note that where, as here, the contract issue can be determined without resort to extrinsic evidence, the question is for the court and not a jury. *Kokomo Veterans, Inc. v. Schick*, 439 N.E.2d 639, 643 (Ind.Ct.App. 1982); *see also Coplay Cement Co., Inc. v. Willis & Paul Group*, 983 F.2d 1435, 1438 (7th Cir.1993) (noting that federal courts applying state contract law follow state rules regarding assignment of duty of interpretation).

*Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir.1997).

The court concludes that there are two grounds for the revocation of the Agreement, resulting in the denial of Ryan's motion: first, the EDS system of arbitration cannot produce a fit arbitration panel; and second, Mr. Penn did not make a knowing and voluntary waiver of his right to a judicial forum. These two grounds will each be considered by the court in turn.

**A. Unfit Arbitration Panel**

■ The court's first ground for denying defendant's motion arises from the method by which the arbitration panel is selected under the EDS provisions—the provisions are incapable of producing an unbiased arbitration panel. The court's research uncovered another case involving Ryan's, EDS, the Agreement, and a plain-

tiff who filed suit in court for the resolution of his or her statutory claims.[4] The Supreme Court of Alabama reversed and remanded the trial court's denial of Ryan's motion to compel arbitration in *Ryan's Family Steak Houses, Inc. v. Regelin*, 735 So.2d 454 (Ala.1999). The court's holding, however, stemmed from the fact that the plaintiffs at the trial court level came forth with no evidence:

> The record is also clear that Ryan's made a prima facie showing that it was entitled to arbitrate the Employees' claims. The Employees failed to present any evidence tending to rebut that prima facie showing. No evidence in the record indicates that Ryan's and EDS are engaged in any form of fraud or collusion. We cannot presume fraud or collusion under the facts of this case, for to do so would *effectively nullify any arbitration agreement calling for the use of a particular arbitration organization* (e.g., the American Arbitration Association).

*Id.* at 457 n. 1 (emphasis added).

This court respectfully disagrees with the conclusion of the Supreme Court of Alabama. What that court overlooked was the uniqueness of the contractual configuration arising under the Agreement. The Agreement is not comparable to "any arbitration agreement calling for the use of a particular arbitration organization." *Id.* Rather, the Agreement sets-up a contractual scenario whereby an employer becomes a third-party beneficiary to a contract entered into between the employee and the arbitrator or arbitration organization.

One of the two dissenting Justices in *Regelin* picked-up on this distinction and argued that despite the paucity of the record, the trial court should be affirmed due to the unfitness of the arbitrator that inevitably arises from this contractual scheme. *Id.* at 461 (Johnstone, J., dissenting). Justice Johnstone in his dissent labeled EDS an unfit arbitrator on two grounds: first, EDS was in collaboration with Ryan's, the plaintiffs' employer, and created a bias in Ryan's favor; and second,

> the arbitration agreement form in the context of the record shows that EDS is collaborating with Ryan's in an elaborate ruse of mutual third-party-beneficiary contracts, with EDS serving as the straw man in each contract—some with Ryan's and its managerial personnel as the other contracting parties, and others with the applicants for employment as the other contracting parties, and with the arbitration provisions binding and benefitting both sets of other contracting parties not only as such but as third-party beneficiaries of all the other contracts—all for the obvious purpose of giving Ryan's all of the benefits of an employment contract with arbitration provisions but without any of the burdens of a written employment contract.

*Id.* (Johnstone, J., dissenting).

Three of the four arguments raised by Mr. Penn in his Response to Ryan's Motion deal with Justice Johnstone's concern regarding EDS as an unfit arbitrator.[5]

---

**4.** The Court of Appeals of Michigan likewise dealt with the exact same issue as that presented in the motion to compel arbitration currently before this court and at issue in the *Regelin* case. *See Rembert v. Ryan's Family Steak Houses, Inc.*, 235 Mich.App. 118, 596 N.W.2d 208 (1999). The Court of Appeals of Michigan remanded the case back to the trial court for a determination of whether the arbitration agreement at issue is enforceable in light of the court of appeals' opinion: "as long as no right or remedies accorded by the statute are waived, and as long as the procedure is fair, employers may contract with

their employees to arbitrate statutory civil rights claims." *Id.* at 210. The Court of Appeals went through a lengthy analysis, providing a framework to direct the trial court in its assessment of the Agreement. The case does little to help this court with its current discussion, given that the Court of Appeals made no determinations regarding the Agreement, leaving that job to the trial court.

**5.** Mr. Penn's first argument in his response is easily disposed of Mr. Penn first asserts that the arbitration agreement is unclear and ambiguous as to the period of time that he is

The first of such arguments specifically regards the mechanism for selecting arbitrators. Mr. Penn asserts that the procedures allow for potential abuse and biased decision makers. In *Gilmer*, the Supreme Court found that " 'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.' " 500 U.S. at 28, 111 S.Ct. at 1647 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 637, 105 S.Ct. 3346, 87 L.Ed.2d 444). Essentially, then, Mr. Penn contends that EDS's arbitration procedures prevent him from effectively vindicating his cause of action (the essence of Justice Johnstone's complaint, as well).

The EDS procedure for selecting an arbitration panel is set out in Article IX:

**Article IX: Selection of Adjudicators**

Section 1: To resolve any claim, dispute, and/or cause of action, a panel of three (3) Adjudicators shall be chosen. One Adjudicator shall be chosen from each of the following separate selection pools:

(a) Supervisors or managers of an employer signatory to [EDS] Agreements;

(b) Non-exempt employees (non-exempt as defined by the Federal Wage and Hour law) who are signatory to [EDS] Agreements;

(c) Attorneys, retired judges, or other competent professional persons not associated with either party.

Section 2:[EDS] shall provide, listed by selection pool, a list of three (3) potential Adjudicators in each of three (3) selection pools. The Complainant shall strike one name from a pool, then the Defendant shall strike one name until one name from each of the three (3) selection pools remains.

Section 3: Any potential Adjudicator may be struck for cause. Any party moving to strike a name for cause must file a motion with [EDS] stating the grounds for such motion prior to the commencement of the striking procedure set forth at Section 2.

Section 4: The chairman of the Adjudication panel shall be the individual chosen from selection pool (c). In all disputers where the claimed amount in controversy exceeds twenty thousand dollars ($20,000.00) the pool (c) individual shall be a licensed attorney.

Employment Dispute Resolution (EDR)*Rules & Procedures, at Article IX (hereinafter "Rules & Procedures"). Mr. Penn asserts that the bias in an arbitration panel produced under the EDS rules and procedures stems from the fact that Ryan's has a contract with EDS. According to Mr. Penn, one obvious ramification of this contract between Ryan's and EDS is the incentive for EDS to "stack the

bound by it. Specifically, Mr. Penn points to paragraph G of the Agreement, which states that My Agreement shall continue for the period of My employment with the Company unless mutually terminated in writing by EDS and Me. Agreement, at B(2)(G). Ryan's asserts in its reply that paragraph E of the Agreement explains that the obligation under the Agreement continues with respect to any claim that arose prior to termination: "I absolutely *must* use the EDS forum for any and all employment related disputes and/or claims and/or related tort claims I may have against the Company and all other signatories to this Agreement which would otherwise be brought in court, even if the Agreement has been terminated since the date of the claim." Agreement, at B(2)(E) (emphasis in original).

It is a general premise of contract law that "contract language is given its plain and usual meaning, and a contract is ambiguous only if reasonable people would find the contract subject to more than one construction." *Kokomo Tube Co. v. Dayton Equipment Services Co.*, 123 F.3d 616, 624 (7th Cir.1997) (quoting *Eckart v. Davis*, 631 N.E.2d 494, 497 (Ind.Ct. App.1994)). The court disagrees with Mr. Penn and finds that reasonable people could not find the contract provision at issue here subject to more that one construction. Paragraphs E and G in the Agreement establish that even if the Agreement is terminated, any claims that arose prior to that termination are still covered under the terms of the Agreement.

deck" against Mr. Penn (or any employee) in its generation of the lists from which the arbitration panel results.

The concern of bias raised by Mr. Penn can be explained by the reasoning used by the D.C. Circuit in *Cole v. Burns International Security Services,* 105 F.3d 1465 (D.C.Cir.1997):

> In the context of collective bargaining arbitration, there are also unique protections for both parties built into the arbitration process that minimize the risk of unfairness or error by the arbitrator. For example, because both unions and employers are repeat customers of arbitration and have a hand in selecting the arbitrator to hear their disputes, arbitrators who regularly favor one side or the other will not be hired again. As a result, arbitrators have a strong personal interest in crafting awards that will be respected as fair by both parties regardless of who wins or loses.

*Id.* at 1475 (citing Bernard D. Meltzer, Ruminations about Ideology, Law, and Labor Arbitration, Proc. Of the 20th Ann. Meeting of the Nat'l Acad. Of Arb. 1, 3–4 (1967); Julius G. Getman, Labor, Arbitration and Dispute Resolution, 88 Yale L.J. 916, 929–30 (1979)).

While addressing arbitration agreements in a different setting, the *Cole* case illuminates Mr. Penn's concerns in the contractual scenario at issue here, as well. Like the union and employer in a collective bargaining agreement constitute repeat customers of arbitration, Ryan's, too, is a "repeat" customer of EDS, thus giving EDS an incentive to load the three lists (generated solely by EDS) from which the three arbitrators are selected exclusively with names that have sided with Ryan's (or any EDS customers/employers) in the past. However, unlike in the collective bargaining context, Mr. Penn (or any other plaintiff/employee who signs the Agreement) is not a repeat customer of EDS— there is no equivalent interest on the other side weighing in to balance or provide a check to EDS's incentive to please Ryan's.

The court finds this to be a conflict of interest such that any arbitration panel assembled under the EDS provisions is susceptible to bias at the employees' expense.

In support of his position, the plaintiff cites *Hooters of America, Inc. v. Phillips,* 173 F.3d 933 (4th Cir.1999), in which the Fourth Circuit held that an employer materially breached an arbitration agreement "by promulgating rules so egregiously unfair as to constitute a complete default of its contractual obligation to draft arbitration rules and to do so in good faith." *Id.* at 938–39. The rules set up by Hooters of America, Inc. allowed the company to unilaterally select the arbitrator and control the proceedings. *Id.* As explained by the Fourth Circuit, Hooters' rules were "so one-sided that their only possible purpose [was] to undermine the neutrality of the proceeding." *Id.* at 938.

Specifically, in *Hooters* "[t]he employee and Hooters each select[ed] an arbitrator, and the two arbitrators in turn select a third. Good enough, except that the employee's arbitrator and the third arbitrator must be selected from a list of arbitrators created exclusively by Hooters." *Id.* at 938–39. The Fourth Circuit explained that this mechanism for selecting a panel

> gives Hooters control over the entire panel and places no limits whatsoever on whom Hooters can put on the list. Under the rules, Hooters is free to devise lists of partial arbitrators who have existing relationships, financial or familial, with Hooters and its management. In fact, the rules do not even prohibit Hooters from placing its managers themselves on the list. Further, nothing in the rules restricts Hooters from punishing arbitrators who rule against the company by removing them from the list.

*Hooters,* 173 F.3d at 939–39. Thus, the Court found that "[g]iven the unrestricted control that one party (Hooters) ha[d] over the panel, the selection of an impartial

decision maker would be a surprising result." *Id.* at 939.

Ryan's asserts, however, that the EDS procedures bear no similarity to those seen in the *Hooters* case:

> [n]umerous safeguards are built into the process of selecting adjudicators to ensure fairness and neutrality of the Adjudication panel. First the EDR program utilizes a panel of three adjudicators: one adjudicator is a neutral, respected attorney; one adjudicator is a neutral employee who is a signatory to an EDS agreement *but who does not work for the employer involved in the dispute;* and the third adjudicator is a neutral manager who is also signatory to an EDS agreement *but who does not work for the employer involved in the dispute.*

Affidavit of James P. Lacoste, Jr.[6] at pp. 2–3, ¶ 6 ("Lacoste Affidavit") (emphasis in original). Further, Ryan's asserts that "EDS is solely responsible for selecting potential adjudicators. The employer has absolutely no input into the selection of potential adjudicators." *Id.* at p. 3, ¶ 8. Thus, according to Ryan's, the scenario for selecting an arbitration panel bears no comparison to the procedure used in *Hooters* because EDS, and not Ryan's (the employer), has the control.

The court realizes that in theory the scenario for selecting the arbitration panel under the Agreement is one-step removed from that procedure shot-down by the Fourth Circuit in *Hooters* –EDS is not Mr. Penn's employer. Yet, however true that may be in theory, the court cannot overlook that in reality the EDS rules and procedures for selecting the arbitration panel bear an almost identical resemblance to the procedure used by the defendant in *Hooters.*

Under the EDS Rules and Procedures, Article IX, two of the three arbitrators on the three-member panel are contractually linked to EDS: one arbitrator comes from a list generated solely by EDS composed exclusively of employees who are signatories to an EDS agreement; and another arbitrator comes from a list generated solely by EDS composed exclusively of managers who are signatories to an EDS agreement. Rules & Procedures, Article IX, section 1(a) & (b). According to the EDS co-owner and chairman, the third arbitrator comes from a list generated solely by EDS composed of "neutral, respected attorney[s]."[7] Lacoste Affidavit at pp. 2–3, ¶ 6; Rules & Procedures, Article IX, section 1(c). The court translates EDS's spin on Article IX to really mean that this third list of potential arbitrators is composed exclusively of EDS-friendly attorneys-attorneys with a huge incentive to favor EDS in the arbitration hearing in order to secure future employment as a name placed on this third list of EDS arbitrators. Thus, all three members of the arbitration panel have an incentive to "scratch" the back of EDS in the hope that EDS will return the favor in the future, and there is no equalizer to this incentive such as that found in the collective-bargaining context, as seen in the *Cole* case. 105 F.3d at 1475.

Further, the "safeguards" cited by EDS and Ryan's are merely illusory. As just explained, all three members of the panel have an incentive to favor the employer in the dispute. Additionally, even though Mr. Penn may strike any potential adjudicator for cause under Article IX, Section 3, all this does is eliminate a name until only one name is left on the particular list. *See* Rules & Procedures, Article IX, Sections 2 & 3. This does not change the fact that EDS has exclusive control over every name placed on each of the three lists. Thus every name has the same potential for bias.

---

6. Mr. Lacoste is thé co-owner and chairman of EDS. Mr. Lacoste's affidavit was filed on March 13, 2000 with Ryan's reply.

7. Under Article IX, "[i]n all disputes where the claimed amount in controversy exceeds twenty thousand dollars ($20,000.00) the pool (c) individual shall be a licensed attorney." Rules & Procedures, Article IX, Section 4.

In reality there simply is no distinction between the procedure for selecting a panel in the *Hooters* case and the procedures employed by EDS–EDS's interest lies with serving its client, in this case Ryan's, and Ryan's role is analogous to Hooters' role in the Fourth Circuit case. *Hooters*, 173 F.3d at 938–39 ("[t]he employee and Hooters each select[ed] an arbitrator, and the two arbitrators in turn select a third. Good enough, except that the employee's arbitrator and the third arbitrator must be selected from a list of arbitrators created exclusively by Hooters."). Ryan's itself might as well be generating the three lists of potential arbitrators. "Given the unrestricted control that one party ... has over the panel, the selection of an impartial decision maker would be a surprising result." *Id.* at 939. Therefore, the court will deny Ryan's Motion, finding that the procedures under the Agreement for the selection of an arbitration panel are so biased and unfair as to call for revocation of the Agreement entered into by EDS and Mr. Penn.

Mr. Penn also takes issue with EDS's control over the location of the arbitration hearing. Article X of the Rules and Procedures provides that "[t]he adjudication panel shall set a time, date, and place for the adjudication hearing." Rules & Procedures, Article X, Section 5. Mr. Penn asserts that the arbitration agreement should be found void because the agreement does not state an exact location for arbitration or state that the arbitration will take place in a location convenient to Mr. Penn, who resides in Ft. Wayne, Indiana. As such, Mr. Penn believes that the procedures as written would impose a severe hardship on any plaintiff.

Ryan's argues that this potential hardship is non-existent, given that the "physical location of the adjudication hearings is the city and/or county in which the employee was employed." Lacoste Affidavit at p. 4, ¶ 12. The Rules and Procedures do not state this. Further, under the EDS Rules and Procedures, the adjudication panel selects the time, date and place for the hearing. With the court's finding that the EDS methods produce biased arbitration panels, *supra*, the court finds that Mr. Penn's argument here is well-founded— Mr. Penn's conclusion naturally follows because the fair application of Article X depends upon an unbiased arbitration panel, an unlikely result under the EDS system.

Lastly, Mr. Penn argues that the EDS rules provide for insufficient discovery. Article XII of the rules and procedures states that "[u]pon the request of either party, each party may schedule a deposition of one individual. Either party may file a request with the adjudication panel for additional depositions, but such requests are not encouraged and shall be granted in extraordinary fact situations only and for good cause shown." Rules & Procedures, Article XII, Section 6. Mr. Penn predicts that he will need at least three to four depositions, as his allegations involve two management-level personnel, one co-worker, and one customer.

Ryan's cites *Gilmer* for the proposition that the Supreme Court "expressly acknowledged and approved of the limited discovery normally allowed in an arbitral forum." Ryan's Reply, at 4. The Supreme Court in *Gilmer* explained that although the procedures at issue in that case "might not be as extensive as in the federal courts, by agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" *Gilmer*, 500 U.S. at 31, 111 S.Ct. at 1655 (quoting *Mitsubishi*, 473 U.S. at 628, 105 S.Ct. at 3354).

This court again agrees with Mr. Penn's argument. Not only is the discovery provision severely limited, but its application is dependent upon the good graces of an arbitration panel stacked against the employee in the first place. So long as the discovery provisions are controlled by the arbitration panel, this court cannot confidently believe that this discovery proce-

dure constitutes a fair trade-off for the "simplicity, informality, and expedition" noted by the Court in *Gilmer. Id.*

This court therefore concludes that the process for the selection of an arbitration panel under the EDS system is biased, and revokes the Agreement entered into by Mr. Penn with EDS and Ryan's as the third-party beneficiary. It follows from this conclusion that Mr. Penn's arguments made with respect to the location of the hearing and discovery procedures provide more evidence of the promulgation of biased rules under the EDS system of arbitration employed under the Agreement, given that the controlling EDS rules at issue here can only be implemented fairly if the arbitration panel itself is unbiased, an unlikely event in light of the court's above discussion. While it is true that Mr. Penn agreed with Ryan's to arbitrate employment claims, arbitration constitutes a system whereby disputes are fairly resolved by an impartial third party. Ryan's and EDS took on such an obligation, but created a sham system and thus failed to perform their contractual duties. Thus, the court will deny Ryan's Motion.

## B. A Knowing and Voluntary Waiver

■ The court finds a second reason for the revocation of the Agreement signed by EDS and Mr. Penn. The court is fully aware that the Agreement which Mr. Penn signed on June 4, 1996, states

> I have read the Agreement carefully and have been given the opportunity to read and consider the full EDS Rules and Procedures. I knowingly and voluntarily agree to be bound by the terms and conditions of the Agreement and EDS Rules and Procedures, as modified and/or amended from time to time.

Agreement, at B(2)(J). The issue the court identifies at this juncture arises from the "knowingly and voluntarily" language contained in the Agreement. Namely, when an individual employee enters into an arbitration agreement which requires him to use arbitration as a condition of employment in the place of judicial resolution of his statutory claims arising under the ADA, does his waiver of that judicial forum need to be a knowing and voluntary one? And, with specific regard to the Agreement at issue in Mr. Penn's case, was the language contained in the Agreement merely illusory—i.e., did Mr. Penn make a knowing and voluntary waiver of a judicial forum for the resolution of his ADA claims?

The Seventh Circuit first made reference to a knowing and voluntary waiver in the context of an individual employee and a pre-dispute arbitration agreement in *Gibson v. Neighborhood Health Clinics, Inc.,* 121 F.3d 1126, 1130 (7th Cir.1997). In *Gibson,* the Seventh Circuit held a pre-dispute arbitration agreement entered into between an employer and an employee invalid for lack of consideration. *Id.* at 1131–32. The plaintiff in *Gibson* was a previous employee of the defendant, Neighborhood Health Clinics, Inc.(NHC). The defendant rehired Ms. Gibson, but before Ms. Gibson returned to work NHC instituted a new arbitration policy for its employees. Employees signed an Associates Understanding ("Understanding") after attending an informational meeting, agreeing to arbitrate claims arising under the ADA (along with other types of claims). The Understanding referenced an employee policy manual which included the terms of the arbitration agreement. Ms. Gibson missed the employee meeting at which NHC informed the employees of its new arbitration policy because she had not yet returned to work. On Ms. Gibson's first day at work, she signed the Understanding and was subsequently given the employee policy manual outlining the terms of the arbitration policy later that same day. NHC fired Ms. Gibson four months later, and Ms. Gibson filed a discrimination claim with the EEOC alleging sex and disability discrimination, and later filed suit in the district court. The NHC moved to dismiss Ms. Gibson's complaint, asserting that Ms. Gibson waived

her right to bring suit in a district court when she signed the Understanding, agreeing to submit to arbitration. The Seventh Circuit held that no consideration existed for the Understanding, allowing Ms. Gibson to continue her case in federal court.[8]

Insofar as *Gibson* dealt with the intricacies of the consideration doctrine, it does little to help Mr. Penn fend off Ryan's Motion. In Mr. Penn's case, consideration clearly did exist between Mr. Penn and EDS—Mr. Penn agreed to arbitrate and EDS agreed to provide the forum. *See* Agreement at B(2) ("In consideration of the agreement by EDS to provide an arbitration forum, Rules and Procedure, and a hearing and decision based on any claim or dispute I (employee/job applicant) may file or defend, I understand and agree to the follow...."). Further, the Agreement states that "[a]ny arbitration matter shall be heard and decided under the provisions and authority of the [FAA]." Agreement, at Introductory Paragraph. Thus, this court cannot invalidate the Agreement under this doctrine given that the Agreement clearly shows the presence of consideration and no evidence to the contrary.

*Gibson* could have helped Mr. Penn defeat Ryan's motion had the Seventh Circuit ruled as it implied it would on the issue of whether the employee's consent to arbitration must be knowing and voluntary. *Id.* at 1130. The court stated, "[w]hile we therefore stress the advantage of arbitration agreements that are the product of an employee's knowing and voluntary consent, we decline today to decide whether such consent is a prerequisite to the validity of an agreement to arbitrate federal civil rights claims."[9] *Id.* Judge

---

**8.** The Seventh Circuit explained that

[i]t is a basic tenet of contract law that in order for a promise to be enforceable against the promisor, the promisee must have given some consideration for the promise. *See Shaw v. S.S. Kresge Co.*, 167 Ind.App. 1, 328 N.E.2d 775, 779 (1975); E. Allan Farnsworth, Farnsworth on Contracts § 2.2, at 61 (1990). Consideration is defined as bargained for exchange whereby the promisor receives some benefit or the promisee suffers a detriment. *B–Dry Owners Assoc. v. B–Dry System, Inc.*, 636 N.E.2d 161, 163 (Ind.Ct.App.1994); *Burdsall v. City of Elwood,* 454 N.E.2d 434, 436 (Ind. Ct.App.1983). Thus, in order for NHC's agreement to be enforceable, there must be detriment to [Ryan's] or benefit to [Mr. Penn] that was bargained for in exchange for [Mr. Penn's] promise to arbitrate all disputes.

*Gibson,* 121 F.3d at 1130 (7th Cir.1997). The Seventh Circuit in *Gibson* first found that NHC could not point to its own promise to arbitrate: the Understanding contained no promise on NHC's part to arbitrate its claims as it was worded entirely in terms of Ms. Gibson's obligations under the Understanding. *Id.* at 1131. Second, the court established that the terms laid-out in the employee policy manual likewise did not constitute a promise by NHC to arbitrate: Ms. Gibson was unaware of the manual's terms at the time she signed the Understanding even though the Understanding referenced the policy manual. *Id.* Even when Ms. Gibson eventually received the policy manual, Ms. Gibson did not assent to the terms in that manual even though she signed the Understanding. *Id.* Lastly, Ms. Gibson's promise to arbitrate was not supported in the form of NHC's promise to hire her or continue her employment—Ms. Gibson was hired before she made the promise and NHC did not communicate to her that if she signed the Understanding she could continue to work for NHC. *Id.* at 1131–32.

**9.** In *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 363 (7th Cir.1997), the Seventh Circuit held that a union may not consent for an individual employee to arbitration in the setting of a collective bargaining agreement: "All we are holding is that the union cannot consent for the employee by signing a collective bargaining agreement that consigns the enforcement of statutory rights to the union-controlled grievance and arbitration machinery created by the agreement." Workers' statutory rights are arbitrable if "the worker brings suit, the employer suggests that their dispute be arbitrated, the worker agrees, and the collective bargaining agreement does not preclude such side agreements." *Id.* The Seventh Circuit explained:

The defendants cite provisions added in the early 1990s to Title VII, the Age Discrimination in Employment Act, and the Americans with Disabilities that "where appropriate and to the extent authorized by law, ... arbitration ... is encouraged to resolve disputes arising under" these laws.

Cudahy in his concurring opinion took issue with the court's decision to not decide whether arbitration agreements must be the result of an employee's knowing and voluntary consent,[10] and called for "realistic" requirements for achieving a valid arbitration agreement in the employment setting:

> [t]hese requirements must recognize that we are dealing in most cases with a contract of adhesion: agree to arbitrate or lose your job. The majority appears to approve NHC's procedure of "the convening of a meeting and the presentation of the appropriate documentation." But we know nothing of what was said at NHC's meeting, not even whether consent to arbitration was imposed as a condition of further employment. And, apparently, the resulting arbitration "agreement" would consist of a patchwork of documents requiring some sophistication to interpret. It seems to me that a knowing and voluntary waiver would require at the least, a single and explicit contractual document.

*Gibson*, 121 F.3d at 1132 (Cudahy, J., concurring) (citations and footnotes omitted).

Judge Cudahy's argument resonates even louder in the case of Mr. Penn. In *Gibson*, the Seventh Circuit implied that

---

42 U.S.C. § 12212. These provisions, a polite bow to the popularity of "alternative dispute resolution" and perhaps a mild sop to the judiciary, which has expressed alarm at Congress's relentless expansion of the jurisdiction of the federal courts, encourage arbitration "where appropriate"—and if we are right it is *not* appropriate when it is *not* agreed to *by the worker* but instead is merely imposed by a collective bargaining agreement that he may have opposed.

*Id.* (emphasis added). While Mr. Penn's case involves an individual employee not in the collective bargaining setting, the Seventh Circuit's decision and reasoning in *Pryner* may provide a hint at the Court's position with regard to the waiver of a judicial forum in an arbitration agreement in a case such as Mr. Penn's: the reasoning in *Pryner* makes the need for a knowing and voluntary waiver even stronger in the case of an individual employee. In *Pryner*, the plaintiffs were members of a union. That membership at the very least gave the plaintiffs in *Pryner* some degree of representation in the resultant arbitration clause in the collective bargaining agreement. Mr. Penn (and other applicants and employees of Ryan's) had *no* representation or voice in the Agreement which binds them to arbitration.

The Seventh Circuit stated in *Pryner* that the

> statutory rights at issue in these two cases are rights given to members of minority groups because of concern about the mistreatment (of which there is a long history in the labor movement) of minorities by majorities. We may assume that the union will not engage in actionable discrimination against minority workers. But we may not assume that it will be highly sensitive to their special interests, which are the interests protected by Title

VII and the other discrimination statutes, and will seek to vindicate those interests with maximum vigor. The employers' position delivers the enforcement of the rights of these minorities into the hands of the majority, and we do not think that this result is consistent with the public policy of these statutes or justified by the abstract desirability of allowing unions and employers to cut their own deals.

*Id.* at 362–63 (citations omitted). It is quite clear that EDS (in establishing this business of providing arbitration forums for clients such as Ryan's) sought to devise a scheme to attract those clients. Thus, it goes without saying that EDS drafted the Agreement so as not to "engage in actionable discrimination" against employees such as Mr. Penn, but it is equally obvious that EDS had no incentive to be "highly sensitive to their special interests"—EDS needed to please its paying clients, not the employees and applicants. *Id.* Further, this is not a scenario such as that approved by the Court in *Pryner* whereby the dispute arose and Mr. Penn subsequently agreed to arbitrate the case with Ryan's. Mr. Penn signed the Agreement written by EDS for its client Ryan's, an Agreement produced with no voice representing the employees. Thus, the case for a knowing and voluntary waiver in the case of Mr. Penn grows stronger, and *Pryner* provides a glimpse into the Seventh Circuit's thoughts on the waiver of a judicial forum when statutory rights protecting against discrimination are involved.

10. Judge Cudahy in his concurring opinion in *Gibson* agreed with the end result but found it "unnecessary to explore all the relatively technical aspects of the consideration doctrine since whatever Gibson signed ... was woefully short of a contract." *Id.* at 1132–33 (Cudahy, J. concurring).

an employer which holds an informational meeting for currently employed workers in which the arbitration agreement is explained would help insure that an employee made a voluntary and knowing waiver of his right to a judicial forum:

> Obviously, the strongest case for a court's finding that an employer and employee agreed to submit claims to arbitration will arise when the record indicates the employee has knowingly agreed to do so. If parties operate under these conditions, we believe that the twin goals of protecting federal rights and resolving claims where possible through arbitration will be effected. Moreover, the formation of arbitration agreements upon terms that both parties understand need not be unduly burdensome. The course that NHC undertook to alert those already employed to the change in policy (the convening of a meeting and the presentation of appropriate documentation) demonstrates the feasibility of achieving this objective.

*Id.* at 1130. Thus, in *Gibson* the employees were currently employed by NHC (and thus not in the precarious position of competing for a job with NHC) and were required by NHC to attend an information meeting with other employees, after which the arbitration agreement was to be signed. *Id.* at 1128. And the Seventh Circuit at least implied that these events insured that those employees in *Gibson* likely made a knowing and voluntary waiver.

█ Contrast *Gibson* with the record in Mr. Penn's case. Mr. Penn entered into an arbitration agreement with EDS, not his employer. The signed Agreement was a separate document from the EDS Rules & Procedures (which did not also require a signature) which explained how the arbitration process worked. At the time Mr. Penn signed the Agreement, he was not an employee of Ryan's yet but was a job applicant. The cover sheet to the job application provided by Ryan's stated,

> [i]n order for you to be considered for employment at Ryan's Family Steak Houses, Inc., you must agree to the terms and conditions in the attached Job Applicant Agreement to Arbitration of Employment Related Services ("Arbitration Agreement"). Your failure to sign and accept the Arbitration Agreement and its related EDS Rules and Procedures will terminate the application process. A Copy of the EDS Rules and Procedures is provided to you with this application package. Should *you* have any questions regarding the Arbitration Agreement and how it works, please *ask the manager conducting your interview.*

Application to Employment, Notice to All Applicants (emphasis added), Exhibit A Hart Affidavit. Unlike the employees in *Gibson,* Mr. Penn was merely a job applicant—he was in the process of competing for a job with Ryan's. Instead of requiring attendance at an information meeting initiated and organized by the employer once the applicant is hired, the application process at Ryan's placed the initiative on the job applicant during the actual interview—a pretty substantial burden when one considers very few job applicants wish to appear "troublesome" in an interview.[11]

The Ninth Circuit has taken a stance on the waiver issue in this context, expressly holding that when an employee enters into an arbitration agreement, that waiver of a judicial forum must be "knowing." *See Kummetz v. Tech Mold, Inc.,* 152 F.3d 1153, 1155 (9th Cir.1998) (holding that plaintiff-employee was not bound to arbitrate ADA claim where arbitration agreement was not entered into knowingly— "the arbitration agreement in the present case is not enforceable because it was nei-

---

11. The Agreement also states *"I understand that I have the right to consult with an attorney of my choice."* Agreement, at B(2)(I) (emphasis in original). The court notes how far-fetched it is to suggest that a job-applicant seeking a minimum-wage position at Ryan's would invest in an attorney to decipher the language of the Agreement before he or she even secures a job with Ryan's.

ther explicitly presented nor explicitly accepted."); *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th Cir.1997) (applying the heightened "knowing" standard to an arbitration agreement the Ninth Circuit held that "[a]ny bargain to waive the right to a judicial forum for civil rights claims, including those covered by the ADA, in exchange for employment or continued employment must at the least be *express:* the choice must be explicitly presented to the employee and the employee must explicitly agree to waive the specific right in question."); *Renteria v. Prudential Ins. Co. of America*, 113 F.3d 1104, 1108 (9th Cir.1997) (applying a heightened "knowing" standard to arbitration agreement entered into by employee in the securities industry); *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1305 (9th Cir. 1994) (establishing the heightened standard of "knowing" to arbitration agreements in the context of the securities industry); *see also Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 150–51 (1st Cir.1998) ("The ADA does not have any express protections against waiver of rights under the ADA. In the end, this case is not distinct enough from *Gilmer* to persuade us that the ADA precludes a waiver of a judicial forum through a *voluntary* prospective agreement to arbitrate." [12]) (emphasis added).

The Ninth Circuit explained in *Prudential Insurance Co. of America* that

[t]his congressional concern that Title VII disputes be arbitrated only "where appropriate," and only when such a procedure was knowingly accepted, reflects our public policy of protecting victims of sexual discrimination and harassment through the provisions of Title VII and analogous state statutes. This is a poli-

cy that is at least as strong as our public policy in favor of arbitration. Although the Supreme Court has pointed out that plaintiffs who arbitrate their statutory claims do not "forego the substantive rights afforded by the statute," the remedies and procedural protections available in the arbitral forum can differ significantly from those contemplated by the legislature. In the sexual harassment context, these procedural protections may be particularly significant. Thus, we conclude that a Title VII plaintiff may only be forced to forego her statutory remedies and arbitrate her claims if she has knowingly agreed to submit such disputes to arbitration.

*Prudential Insurance Co. of America*, 42 F.3d at 1305. The Ninth Circuit applied this same policy to ADA claims. *See Nelson*, 119 F.3d at 761 ("[j]ust as a knowing agreement to arbitrate disputes covered by the act is required by Title VII, so too a knowing agreement is required under the ADA.").

*Prudential Insurance Co. of America* and *Renteria* (the Ninth Circuit's first two cases dealing with the heightened "knowing" standard) both dealt with this issue in the setting of the securities industry. Within the securities industry exists a contractual set-up similar to that existing under the EDS system whereby an employee is required to register with securities exchanges or organizations using the securities industry's "Form U–4", which requires that a securities trader (the employee) arbitrate before a panel of securities industry arbitrators any dispute with his or her employer. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (holding

---

**12.** This case involved an arbitration agreement (contained in an enrollment agreement) entered into between a private non-special needs school and parents of an enrolled student with Attention Deficit–Hyperactivity Disorder. 133 F.3d at 147. The First Circuit reversed the district court's denial of the defendant's motion to compel arbitration of the plaintiffs' claim under the ADA. *Id.* at 144. It

is curious whether the First Circuit meant the insertion of the word "voluntary" in its holding to signify a heightened standard, or whether the word stemmed from the fact that the plaintiff-parents "neither claimed that their agreement to the terms of this contract was involuntary, nor that they otherwise signed the agreement without knowledge of its arbitration provisions." *Id.* at 147.

that the FAA required the enforcement of the pre-dispute mandatory enforcement clause in the Form U–4); *Koveleskie v. SBC Capital Markets, Inc.,* 167 F.3d 361 (7th Cir.1999) (holding that employee alleging employment related sexual-discrimination under Title VII could be compelled to arbitrate and finding the securities industry's arbitration procedures adequate due to lack of showing of actual bias in securities arbitration process). Any person working in the securities industry knows that he or she will have to sign a Form U–4—the Form has been around for years and is a staple in the securities industry. Yet, even in this setting, in both *Prudential Insurance Co. of America* and *Renteria* the Ninth Circuit held that "even assuming the appellants [employees] were aware of the nature of the U–4 form, they could not have understood that in signing it, they were agreeing to arbitrate sexual discrimination suits. The U–4 form did not purport to describe the types of disputes that were to be subject to arbitration." *Prudential Insurance Co. of America,* 42 F.3d at 1305; *Renteria,* 113 F.3d at 1106.

EDS itself asserts that its program is modeled after that used in the securities industry. *See* Lacoste Affidavit at p. 2, ¶ 3. However, the court finds several distinctions between Mr. Penn's case and the securities industry's use of the Form U–4. The Form U–4 is required industry-wide and established in the securities indus-

try—it is a virtual institution within the industry—whereas the Agreement used by EDS is rare and has not risen to any level of prevalence and acceptance in the minimum-wage, chain-restaurant market. Further, presumptively there are educational differences between the average job applicant at a Ryan's Steakhouse and the average employee working in the securities industry to whom the Form U–4 applies. Lastly (and perhaps most importantly), the securities exchanges do not in turn have contracts with the employers to provide arbitration services, whereas EDS's sole business purpose lies in providing arbitration services to clients such as Ryan's.

Add to these differences the burden placed on the employee in the EDS scenario. At the time of application and during the interview, the applicant is forced to take on the initiative to inquire into and discuss the intricacies of the pre-dispute arbitration agreement (an agreement that is entered into with EDS and lists Ryan's as a third-party beneficiary). Such a discussion initiated by the applicant would first require that the applicant have understood the Agreement and the EDS Rules & Procedures. This court is hard-pressed to believe that the average job applicant at Ryan's competing for a job washing dishes or waiting tables could possibly pick-up on the intricacies of the Agreement and understand the contractual scenario involved,[13] and then boldly pose questions to

13. An example of a nuance within the Agreement which the average applicant to Ryan's will likely fail to fully understand and appreciate deals with the availability of an appeal following arbitration. The Agreement states that "[t]he decision of an EDS arbitration panel is final and binding on all parties. There is no appeal by any party on the merits of the dispute either to State or Federal Court." Agreement, at B(2)(B). The Agreement also states that "[a]ny arbitration matter shall be heard and decided under the provisions and the authority of the Federal Arbitration Act." Agreement, at Introduction. Section 10 of the FAA provides a list of situations where an arbitration panel's decision may be vacated:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
(1) Where the award was procured by corruption, fraud, or undue means.
(2) Where there was evident partiality or corruption in the arbitrators, or either of them.
(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

the manager conducting his or her interview or consult an attorney before signing. In this context, the court finds that Mr. Penn did not make a knowing and voluntary waiver of a judicial forum in this setting.

Such a finding protects not only employees such as Mr. Penn, but the integrity of the ADA as well. Under the EDS system implemented by Ryan's, the court finds an even stronger need for a knowing and voluntary waiver given that the Agreement is entered into between a potential employee and EDS (as opposed to the employer), and Ryan's provides no required informational session prior to an applicant's entering into the Agreement. The court agrees that arbitration is an effective and efficient method of resolving disputes. And the court further emphasizes that pre-dispute arbitration agreements may one day establish a niche in this individual-employee setting comparable to that established in the securities industry. However, a knowing and voluntary waiver likewise needs to be a staple in this individual-employee setting as well in order to preserve the very reason Congress enacted statutes such as the ADA—the protection of the individual and his rights.

As a result, the court will deny Ryan's Motion to Dismiss and Petition to Compel Arbitration and Stay Proceedings. In so doing, this court holds that there has been no showing that Mr. Penn made a knowing and/or voluntary agreement to waive a statutory remedy provided by the ADA. In this setting, where an individual waives his right to a judicial forum in a pre-dispute arbitration agreement such as the Agreement entered into between EDS and Mr. Penn, this court agrees with the Ninth Circuit's heightened standard of ensuring that a waiver of that judicial forum be at the very least knowing, and/or voluntary.

In conclusion, the court will DENY Ryan's Motion to Dismiss and Petition to Compel Arbitration and Stay Proceedings for the following two reasons: first, the EDS Rules and Procedures regarding the selection of an arbitration panel result in biased panels, and affect the application of the EDS Rules and Procedures dealing with the time and place of the hearing and the discovery procedures used; and second, Mr. Penn did not make a voluntary and knowing waiver of his right to a judicial forum when he signed the Agreement.

## CONCLUSION

For the foregoing reasons the court DENIES defendant Ryan's Motion to Dismiss and Petition to Compel Arbitration and Stay Proceedings filed on January 21, 2000.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its decision, direct a rehearing by the arbitrators.

(B) The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5.

9 U.S.C. § 10. To an attorney, the Agreement's use of the wording "on the merits" and coverage under the FAA reveal that the Agreement is technically not in conflict with the FAA. However, it is quite a stretch to think that the average job applicant to Ryan's will appreciate exactly when and under what circumstances he or she is able to appeal an arbitration award. The appeal language reveals that the Agreement is misleading at the very least.